Court. We should not be allowed to do that after we spent our weekend poring over it, but we still have two out of our three cases today involve bankruptcy, and so you'll have to excuse us if we start spouting sections that are relevant to a different case that's before us. It's been quite a challenge for all of us, but as an old district court judge, I'm thrilled to see bankruptcy court cases again. Stated with all sincerity, Judge Barry. Thank you. All right, we'll call our first case for the day, Hechinger Investment Company v. Universal Forest Products, Inc. Your Honors, Michael McAlee representing Universal Forest Products, the appellant in this case. Your clerk has asked me to indicate that I'd like to have four minutes for rebuttal. Could you pull the mic a little closer to you, please? Sure. Thank you. I am, given the time limitations that we're under today, I'm going to try to limit my But then added that, quote, whether the payments were substantially contemporaneous is of no moment. Hechinger came to that conclusion because the bankruptcy court held that credit transactions are, as a matter of law, excluded from the scope of the defense, even if substantially contemporaneous. Isn't that kind of bizarre in that preferences involve payments on account of antecedent debt? So a credit, I mean, a preference by its very nature must be a credit relationship, must it not? Well, I certainly agree with the court, and that's our central point. I mean, I'm throwing you a ... But didn't the district court clean that up in its opinion and explain what the bankruptcy court certainly meant? I think the district court spent all of three quarters of a page in the contemporaneous exchange defense. I don't think he cleaned it up very much at all. This fundamental problem of if you construe the contemporaneous exchange defense as not including credit transactions and why it renders the defense a statutory nullity, I don't think the district court said even a word about that subject, Your Honor. Our argument that excluding the contemporary or excluding credit transactions from the contemporaneous exchange defense is invalid for three reasons. First, as the court mentioned, it renders the defense a statutory nullity. Second, there were no cases cited to the bankruptcy court or cited by Hechinger that actually stand for that proposition. And third, it threatens the policy objectives of the code. Your Honor, Judge Rendell is exactly right. Preference is by definition a payment on antecedent debt. A payment on antecedent debt is a credit transaction. If one excludes credit transactions from the scope of the defense, one excludes literally every conceivable transaction to which the contemporaneous exchange defense could apply. Isn't the real problem here that the bankruptcy court didn't decide intent, did not decide the issue of intent? And I think what Judge Barry is referring to in terms of Judge Jordan having cleaned it up is the fact that he did focus on the fact that there needs to be a requisite intent finding. But we don't have a finding as to intent. What is there in the record as to the intent of the parties? And P.S., I wonder if the parties have two different intents, how you resolve that. But what's in the record about the parties' intents? Well, the court basically concluded, made an intent conclusion, which I would submit is entirely a function of the court's conclusion regarding the scope of the defense. That is, he held that Hechinger did not intend credit transactions. He very much did not hold that Hechinger did not intend contemporaneous exchanges. In fact, the trial court himself held that the vast majority of the transfers in this case were, to use his terms, virtually simultaneous. So, the court, by way of its intent holding, by holding that Hechinger did not, that Hechinger intended at least in part credit transactions, essentially sidestepped the intent question which is present in every contemporaneous exchange defense case, or ought to be at any rate, and that is whether the parties intended transfers that were substantially contemporaneous. Can I stop you for a second? Sure. You just said substantially contemporaneous. Aren't you conflating A and B? I mean, when you're dealing with intent, I don't see substantially before contemporaneous. Now, B does have that, and you make that point as well, you put substantially before contemporaneous in dealing with intent on page 27 of your brief as well. What is the standard when you're dealing with intent? I would suggest that the intent must both be for a substantially contemporaneous transaction and the transaction itself must be substantially contemporaneous. No, but you've got to take substantially out of, because it's not in this, I think that's Judge Chigares' point. It is. I mean, contemporaneous may mean substantially at the same time, but we can't define contemporaneous with substantially because it's not in the statute. I understand that point, but the statute cannot accomplish its purpose if you construe it that way. And there are several recent cases that have helped. You're saying it can't be exactly at the same time, because then it wouldn't be antecedent. It has to be contemporaneous means during or around? Right. Well, there is that metaphysical problem of what contemporaneous means if you don't attach the word substantial to it. I'm not sure there is an answer to that question. But also, one of the policy objectives of the contemporaneous exchange defense is to the debtor as it enters into financial trouble. In order for that policy to be effective, the parties must act with intent. They have to intend to engage in a credit transaction, because it's precisely court short-term credit transactions that the debtor needs during those phases of financial difficulty. But in Section A, there must be some significance to the fact that Congress left out substantially before contemporaneous, right? You could construe there to be significance to that. But I would suggest that the recent cases have not gone in that direction. The recent cases... But the evidence... The evidence... Nichols' testimony was quite clear about your intending the wire transfers to apply to existing debt, not to apply to new orders coming in. No, I think, frankly, her testimony, Your Honor, was just the opposite. She testified that the credit limit was set up, in this case, in such a way that the orders and shipments... Whenever you're getting up there, toward that credit limit, they're looking for either another half a million dollars or a million dollars, lump sum, to come in. Correct. Now, why would they be looking for that if it's to pay only for future orders or for existing orders? They have to get that credit limit down. They have to get the monies owed down before you can ship. Let me answer that in two ways, if I can. What Ms. Nichols said is that whenever a payment was made, it was split about evenly between payments in advance and payments on the antecedent debt, because the credit limit applied both to orders that hadn't shipped and to already shipped orders. That's why we end up with that payment graph that I displayed so prominently in my papers. But if you weren't paying for past debt, if you weren't paying for past debt, you wouldn't have a problem as long as the orders were under a million dollars, right? If I weren't paying for past debt, there wouldn't be a preference. That's the problem. There wouldn't be a preference. The point here is that I'm making substantially contemporaneous payments that include both payments in advance and payments on antecedent debt in a very narrow range. Let me ask a question about what went on here. You had a million dollar credit line that was constantly being paid off and new value extended. Correct? $500,000 would be paid, taking the debt down to $500,000. Immediately they would ship another $500,000, correct? Not exactly. Not exactly. All right. Tell me how I'm wrong, because what I'm getting at is, and this is an argument that hasn't been made, that I don't know if it would be valid, but if it were that the pay down gave rise to the existence and the utilization of new credit, which equals new value, why does that not, you know, resolve in your favor by virtue of the way this transaction worked? Well, it may very well. What was happening here is that since the credit limit applied both to orders and shipments, if $500,000 of shipments had gone out, and while those shipments were going out overnight, UFP received $500,000 of new orders, the new orders would not ship unless one million was paid. In other words, those $500,000 of orders would be paid in advance. But there's always a give back by UFP of credit to the debtor. Absolutely. And when that's the case, and your opponent's going to have to answer this, because I'm speaking on your behalf, if you will, this is what the Bankruptcy Code intends should happen. That, in fact, Heckinger doesn't part with money, and then the creditor go off and have gotten something that somebody else didn't get. If the creditor then contributes something back into the estate, in the terms of new value and other shipments, then that really is what this is all about, isn't it? That's correct. These payments were happening every two and a half days, a million dollars every two and a half days. And as the wire paid down, more product was given, more credit. Credit is new value if it's used. Shipments were running like 20 trucks a day. I mean, this was a huge volume of business, exchanging back and forth. You were the one creditor who, when they filed for bankruptcy, had been totally paid off, and you'd been totally paid off because Heckinger had to pay real fast and had to pay real hard. So, were you not really a preferred creditor in that sense? I think absolutely not. The reason we weren't a preferred creditor is that every time we got paid, we extended an equal amount of new stuff. You gave them product. We are not like a similarly situated creditor with a bunch of old debt that gets paid off on the eve of bankruptcy. That didn't happen here. There was no debt to pay off. Remember, too, that throughout these parties' relations, the invoices were paid, I think the data is something in the range of 80 to 90 percent of Heckinger's invoices were paid off to UFP in the three years prior to bankruptcy, in 17 days or less. This is a historical fast-pay customer. As a bulk matter, over the 90 days, did you give as good as you got—now, don't shake your head at counsel table. You can speak to the mic when you get up—but did you give as good as you got in terms of For instance, you shipped $20 million worth and you got $20 million. You had a silent slowdown. That's the answer, didn't you? No, the shipments to the debtor during the preference period were almost exactly $16.5 million, and the payments from the debtor were just more than $16.5 million. They correspond almost equally. But you held back on your shipments until you got more wire transfers, didn't you? If we would receive orders the night before, and you typically would release the orders at 10 a.m. the next morning, but the wire hadn't come yet, we would hold the order until we got the wire, if that's correct. However, even Hechinger's people testified that that really wasn't a stop ship. That was in—at the end, many of the held orders were held because Hechinger asked us to hold them. They didn't want the inventory. So look, the bankruptcy court completely rejected the nefarious plot theory that somehow we were up to some devious purpose by holding orders here. And that's not before us. That's not before us. All right. We'll hear from you on rebuttal. Okay. Thank you, Your Honor. May it please the Court, Joseph L. Steinfeld, Jr., representing the Polly Hechinger Investment Company and the Cross Appellant. Judge Randall, I would like to address your question, if I can, to start with. This is definitely, I believe, the intent was established in court. On many cases, there was testimony that the parties intended a credit transaction. The judge didn't make a finding about intent vis-à-vis contemporaneous exchange for new value. I think he did, Your Honor. I think he did. Where is that? Based on the record. I think he found that they intended a credit transaction. Where is that in his opinion? It's A37 is his opinion. He talks about the testimony and then he says on 47, it's well established that 547C1 defense may not be applied to credit transactions. And then he cites three cases where there are very long lag times, I mean, admittedly 40 days, whatever. I understand, Your Honor. On the issue, though, I think he goes through the facts of the case, which I would like to briefly summarize that the Court talks about, which is that there was an intention, there was a deal that was struck. And at the time the deal was struck, it was to give Hechinger a $1 million credit. Because originally they had unlimited credit. In order to facilitate that, the parties had to agree to do what are called cash calls. It's as if you had a credit card and you have a $1 million credit limit or a $1,000 credit limit. And when you reach your credit limit, all of a sudden the credit card company denies your charges and says, I'm not going to take any more charges from you. They're not going to give you any more credit unless you pay it down. So then when you pay it down, you specifically earmark that payment for the older shipments. And that's what happened here. The shipments were earmarked, I'm sorry, the payments were earmarked for the older accounts. That's indisputable. But why does that matter if by paying down you then free up? I mean, the idea is you are exchanging that for new value being given under the line. But this Court has held in the Spada case that you have to establish what the new value is that you're exchanging for. And you have, in other words, you have to earmark it. Take, for example, the Payless Cash Waste case that the defendant relies upon. In that case, the payments were earmarked. They were specifically invoiced. And it was said, you must send us a check or wire or overnight delivery for these particular payments that we're now going to ship out to you. That's a very important distinction. And I would like the Court to look at Appendix 1325. Very important.  And what you saw here, and it's the running balance of this account, and you can see that in the beginning of the preference period, the payments were made on, obviously, on embezzled debt. And they were paying, the payments were being applied to the oldest invoices. When were they applied, though? There's testimony that when they paid them down, they really didn't know what they were going to be applied to. And it was only when they got remittances two weeks later that they went and they just did it based upon what you said had been paid. Or vice versa. What they said. Well, technically, the uncontroverted testimony, and it's in our brief at page 60, but the uncontroverted, make sure I got the right page here, the uncontroverted testimony was that both parties intended it to be a running balance and that, for example, Mr. Schumacher and even Ms. Nichols testified that they, I'm sorry, page 36 of our brief, and this And I had asked Ms. Nichols a follow-up question. And was your understanding, too, that once you got the money internally, you booked it against the then-already-shipped borders? In other words, you reduced your credit exposure at that point. Answer. We reduced our credit exposure, yes. Mr. Schumacher testified that the party's intent for the wire transfers was to reduce outstanding debt. Question. At the bottom, she says, we'll expect you to continue, we expect you to continue to limit. Do you see that? Answer. Yes. So that the wires were supposed to reduce the credit limit so that additional purchases could be made. Correct. Correct. So the point I'm getting at, Your Honor, is this is very much like the Contemporary Homes case, which we cited in our brief, where you have a credit limit established, and you have a situation where once you bump against the credit limit, you then pay money to free up additional invoices. The same thing, the testimony is replete on page 37 and 38 of our brief. Mr. Smith, who was our witness, testified that if there was a million dollars in credit we used, we used a million dollars in credit already, my goal was to keep them at a million dollars in credit. And what happened was, because of these silent slowdowns and shipment delays, the deal was undone. That Packager was promised that it would have this one million dollars, and it was denied that. And if you look at page 1325 of the appendix, you'll see that on April 8th and April 10th and April 11th, the high credit was reached at a million forty-nine dollars, forty-nine thousand dollars and change. Thereafter, they were making cash calls of half a million or a million dollars, and it was getting reduced and reduced, so that finally, by a week before the preference period, or a week before the filing, the defendant in this case, the appellee, I'm sorry, the appellant, had a million two hundred and forty-five thousand dollars of Packager's money. So here we had the most preferred creditor that I could think of as a bankruptcy attorney. You have a situation where the parties had a deal. The deal was that we were going to make sure that we would always have a million dollars of credit. And if you can build this type of conduct without earmarking, and that's the critical thing. Well, but you got product, didn't you? You got product, but what happened was, they were preferred to the million dollars that we sought in this proceeding, because the deal was that, yes, we got product, but at all times, we were going to have a million dollars of credit. When you hit the million dollars of credit, you have to pay down. Which freed up another amount of credit. But the problem is, at the end of the day, because of the slow shipment, I would agree with you, Your Honor. Give me at the end of the day what happened. At the end of the day, this defendant, appellant, had over a million dollars of Packager's money in the bank. To the good. So the creditors of Hechinger, the creditor body, the estate was depleted. Two million dollars. Now, I thought your friend took issue with that in the reply brief. But I was going to ask you, the testimony was that wire transfer was never received. Your Honor, it was received. They had no debt. What Your Honor needs to look at is on page 1326. The petition date was 5-11. You're correct that the wire was reversed. But four days earlier, they had a million dollars of Hechinger's money. So in other words... It was reversed, though. It was reversed. It was reversed. You make it sound in your brief that they were bad people. Because of their manipulation, there was a two million dollar difference here. That's not so. Well, it isn't so at the petition filing date. There was a $1,072,000 difference at the petition filing date. But I submit, Your Honor, that from... Again, if you look at page 1326, you'll see that on April 27th, all the way through June 7th, they were basically at a million dollars to the good. Now, why would they have to be a million dollars to the good? They shouldn't be. The reason why... Because it says at 1335, which I think is a devastating piece of evidence... Oh, this is Ms. Nichols. We have tightened our credit. We'll continue to try to keep our exposure at zero. But please do not discuss this. They still believe they have a credit, a $1,000,000 credit limit. They are wire transferring to us based on orders in the system. The orders are starting to ship slower. So we've been able to stay ahead of the game. And the reason the order was starting to ship slower is because they were told to ship slower at A1330. Exactly. Silent slowdown. So we had a manipulation of the credit schedules here, which this court in molded acoustical products outright condemns. So, Your Honor, I'm not asking them to give back $16,000,000. I just want the $1,000,000 credit that they were promised. Just like if the credit company lied to you. If they told you, oh, no, you've reached your credit limit. You need to send us $1,000 in order to free a product. Oh, by the way, you need to send us another $1,000. But meanwhile, I'm the thousandth of the good. Oh, you filed bankruptcy. Now all of a sudden the credit card company has $1,000 of your product. Where in the appendix is it clear that, for example, they shipped $16,000,000 worth of product but got $17,000,000? That is clear by, again, A1325. Because if you look at A1325, you'll see that as of the petition filing, 90 days prior to the petition filing date, there was a credit balance owed to UFP of $455,545. Hechinger was a creditor of UFP. Which day are you talking about? I'm sorry. A1325, which is the running balance, and it was an exhibit admitted into evidence, P12B. And at the beginning, the first day, the 90-day before the filing date, UFP was owed $455,000. On the filing date, I will agree with Your Honor, Judge Barrett, we did misspeak when we said the million because of that transfer. The point I was making, though, that five days earlier, there was a million to the good. But even on the petition filing date, there was $72,000 in change to the good. In other words, UFP was overpaid by $72,000. Simple math will tell you, therefore, that they improved their position by approximately half a million, $520,000. Half a million? So how is that a million? That's an easy answer I can give you, Your Honor. The reason is the preference statute doesn't look at improvement of position. That's certainly an element of preference. The reason is you need to look, again, at exhibit page 1325, and you need to look at their high credit. Their high credit was on April 9th of that year, 2000, and 2001. And in there, the high credit was at about $1,049,000, give or take, you know, some dollars. So the way the preference statute goes is that because we have subsequent new value, that once you get to your high credit, that's the point in which you say a bankruptcy could occur at any time during that 90-day period. When you get to your high credit, if the bankruptcy had occurred on the point of the high credit, that's your maximum exposure, after which you get your new value defense, which, by the way, we're giving them. They get the benefit of these subsequently shipped goods. You want their subsequently shipped goods to be somehow, to be a contemporary exchange for new value. But they're not. They aren't valued. And that's the point of the code. If you think about it, it's not an unfair result. But contemporaneous does not mean exact. Contemporaneous means occurring during the same time. And I think it's a question of what's the time we're talking about. Well, Your Honor, I think Judge Chiguera's hit the nail on the head. I hope I didn't mess your name up, Your Honor. The statute clearly says that it's to the extent the parties intended a contemporaneous exchange and the exchange itself was substantial contemporaneous. A clear meaning reading of that statute is it's the intent. I have to intend a contemporaneous exchange could be 10 days, 20 days, or a microsecond. But if I don't intend it to be one, and in this case, when I thought I was setting the money, I thought I was paying bills that were 10 days old, 15 days old. Some of the bills that were paid were 80 days old. Some were a day old. I agree with that. Judge Rendell suggested earlier that the bankruptcy court did not adequately address the intent requirement. But we're reviewing what the district court did. That's correct. Not what the bankruptcy court did. And the district court did make a finding on intent. It did? And that is reviewed by us as a question of fact. That is correct. Under the clearly erroneous standard. Correct. The clearly erroneous. And the court knows that it's not that you, other than the same factual circumstances, would necessarily reach a different result. It's whether or not there was enough facts to support the result reached by the trier of fact. In this case, the bankruptcy judge and the district court judge. Now, the important point there is that he did clarify it. It was an intent to make a credit transaction. That's very important. The evidence is clear. Everyone agreed it was a credit transaction. And you cannot have, you take the example of the case that he relies upon, the 8th Circuit, it's really the 8th Circuit bout case, of Payless Cashways, the Silberman case. And read that case carefully and you'll see that that court is talking about an intent to make a COD shipment, cash on delivery. Now, it may be, the whole idea of the contemporaneous exchange for the value defense is Congress didn't want to say which came first, the chicken or the egg. So they were saying as long as there was an intent to exchange in exact amount, earmarked money for product, you know, money for product, as long as you intended that exchange to occur, like a COD, that's okay. But if your intent was simply to pay down existing debt and then you ship new debt, that's what the new value exception is for under 547C4. You agreed with Judge Barry that we review the district court, but don't we in doing so review the bankruptcy court's finding of fact? I mean, we sit in the same position vis-a-vis the bankruptcy court that the district court did. Well, that's true. But I think you could do the same thing that the district court did. First of all, you review the facts themselves. And you could say, is there an evidence of intent in the record? If the judge made a misstatement of the law by saying that I find that credit transactions are not covered by the contemporaneous exchange defense, well, that's a legal statement. That's not a factual statement. Yeah, but it seems to be, it's pretty diverting from other, you know, it seems to be that's where he's going. He's not really concerned about intent. Should we not remand this for him? No. To make a clear finding as to intent of a contemporaneous exchange for new value, whether that existed or not? I think, Your Honor, if you can look at it the same way that the district court looked at it, and you should, that you can say, does the record support evidence of intent? And also, did the judge mean intent, that I intended a credit transaction? Not that there actually was a credit transaction. And, in fact, the case law that is cited deals with that very issue of intent, whether they intended a credit transaction, not whether there was a credit transaction. As the district court says, the bankruptcy court was focused not on the mechanical timing of the payments when it talked about the credit, but on the party's intent to form a credit rather than a cash relationship. Yeah. And he wasn't wrong. Right, he wasn't wrong. And, again, payless cash rates, that case, they did not intend there to be a credit transaction. Even though there was a credit transaction. Here, they did not intend it to be a credit transaction, even though some of the transactions weren't on credit. Because, it's obvious, those are the advanced ones that we didn't seek. So, I think... Well, but if they intended it to be a credit transaction, that doesn't end the argument. Because preferences by their nature are antecedent debt, or credit. I think that's different, Your Honor. Intending it to be a credit transaction is not the same thing as antecedent debt issue. Because you could intend a non-credit transaction and have antecedent debt, which is what happened in the payless cash rates, where there was clearly an intent to make this contemporaneous exchange. But I'd like the court to focus on... Okay, the credit transaction... I mean, you're flipping it around. The credit transaction, by its nature, of necessity, must be an antecedent debt. Well, I would agree. But the issue is of intent, of whether you intended it to be. Well, the issue here is the intent of contemporaneous exchange, not intent for a credit transaction. Okay, and here the intent was that I intend to pay down all my old invoices. That's clear. That's what the record says. If I intend to pay down all my old invoices, am I exchanging the new value that I'm now going to ask you to give me for that particular payment? And there's no case. But there are... Well, there are cases that say 7 days, 10 days... That's not a problem. ...is sufficient. I agree with that, Your Honor. And, you know, even if the intent is to pay the old invoice, even though it's 10 days or 7 days old, in a running title, we just don't know what the bankruptcy court thought about that. With all due respect, Judge Randolph, there is no case that provides a flat sum payment that is not earmarked for a particular invoice at the time of payment, not some 2 or 4-week later period when you reconcile. It supports the finding of contemporaneous exchange. Every contemporaneous exchange case says that this is what I'm shipping you and this is what you're going to pay. So that you have... It's the timing element. Otherwise, you could protect millions of dollars of these credit transactions that happen in this case by alleging contemporaneous exchange. That's not the purpose. This defendant got preferred. There's no question about that. It got over a million dollars of money. They had to prove intent of contemporaneous exchange. They did. That was their burden. And they didn't make that burden. That's another good point. They didn't... I'm trying to make points for both sides. I appreciate your fairness, but that is true. It's not our burden. We proved our case in chief. If they failed to prove intent and the court couldn't find intent, you can review the record as a whole and say there is no evidence sufficient to overturn the finding of no intent to make a contemporaneous exchange. You definitely can do that. And I think the district court did that when it said that, well, maybe the judge misspoke about the legal standard, but this record is clear. There was no intent to make a contemporaneous exchange for these payments. There was definitely an intent to provide new value afterwards, which is fine. That's the new value exception. That's the person's value. Why wasn't the paydown... Why wasn't the paydown a contemporaneous exchange for the new value? Because it wasn't earmarked for those future shipments. It was earmarked to pay down the credit. So future shipments couldn't ship, which is why we have the new value exception, which is the major exception to the Bankruptcy Code and ensures fair treatment, equal distribution of the creditors. And you're saying they... their proof focused on the fact that the payment made was for shipments, not for new credit. Their... All the testimony... That's their testimony. ...was their testimony and our testimony was the payment was for the... to pay down the line for the old shipments, not for any earmarked new shipments. They did say we're holding back shipments until you pay back your debt. Credit card company, you've got to pay it off if you want to charge something more. Thank you, Your Honor. I'm sorry. Thank you very much. All right. Thank you. Mr. McEvoy? In the brief time I have left Your Honor, I'd like to say something about the consequences... Come to the microphone, please. Sure. I'd like to say something about the consequences that would occur if Mr. Steinfeld is right. The... the Dohart case in particular holds that one of the... Which case? May I have a second? It's not mine. It's the Dohart case... 224. Do you want me to cite it in your brief? It is. Dohart? Dohart. D-O-R-H-O-L-T. The court in that case held this, and this is a quote. Section 547C1 provides that a transaction is not a preferential transfer, even if made on the eve of bankruptcy. Yet the creditor provides new value in exchange for the debtor's contemporaneous  for example, in that case, it was a security interest. Other creditors are not adversely affected by such an exchange because the creditors are not adversely affected by such an exchange because the debtor's estate has received new value. Moreover, this exception encourages creditors to continue dealing with a troubled company which may allow the company to escape bankruptcy altogether. But I don't think your testimony pointed to the fact that that's what the exchange was for. Didn't the testimony point to it was we were paying it down on account of prior invoices and shipments? No, the testimony was that every time they made a payment, a wire transfer, it paid somewhere between half or approximately half of the money went to shipments that had shipped within a few hours or days before the payment was received and the other half was applied to shipments that hadn't yet gone out and was paid in advance. And that's how we achieved the result in this case where you have approximately $7 million paid in advance and $7 million paid on antecedent debt in a very narrow range. Right, but you're saying it was tied to shipments. It wasn't tied by virtue of the testimony to we paid $500,000 so that we would get an extra $500,000 worth of credit. I mean, I just don't see that. It's an argument that I would make but I don't see it in the testimony. Every time they made a payment, they got more credit equal to the payment. That was, that's what happened. But where's the evidence that that was the intent as to why the payment was made? I would use as a chief example, I think it's our exhibit number. And by the way, the doorhole case is not in here, but go ahead. It's not? No, not in your blue brief or your reply, but, or at least it's not listed in the index, but go ahead. Is that the first name in the case? Yes, 224, Feb 3rd, 871. Well, whatever. If I haven't cited it, Your Honor, I apologize. What about the fact that during the term of the 90 days before, you did get more than you gave in terms of payments versus product? We were often in a net plus credit position before the bankruptcy, before the preference period started, precisely because we instituted this in, I think it was in early February before the preference period even started. So this payment regime that we've described as having continued throughout the preference period was started before the preference period started. So there wasn't any antecedent debt. If we agree with you, wouldn't the proper thing to be, on the intent issue, wouldn't the proper thing to be remanded to the bankruptcy court for some findings on intent? I think there are two questions on that. If you look at what the bankruptcy court held, I think it's quite clear what the bankruptcy  was that they didn't include credit transactions from the scope of the defense. It's all driven by the court's conclusion regarding scope. The court held that these transactions were virtually simultaneous and intended to be by the parties. Well, he says, payments then apply payments of the prior invoices as directed and specified. Hechinger urges these facts support his argument. Neither Hechinger nor UFP possess the requisite intent necessary to sustain the claim defense. Because they intended credit transactions. Here, while UFP contends frequent telephone calls have requested, the record supports Hechinger's argument. Such calls merely alerted Hechinger to the fact that orders could not be shipped unless and until they remitted funds. All right. I guess it's a question of interpretation of how we read that opinion. May I have just a couple more minutes since Mr. Hechinger is here. I'll call our next